IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIAN MACHESKY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 07-09 |
| | ) | Judge Gary L. Lancaster/ |
| CHIEF HAWFIELD; LIEUTENANT | ) | Magistrate Judge Amy Reynolds Hay |
| BATES; WAYNESBURG BOROUGH; | ) | |
| WAYNESBURG BOROUGH POLICE | ) | |
| DEPARTMENT, | ) | |
| Defendants | ) | |

## REPORT AND RECOMMENDATION

### I.  RECOMMENDATION

This civil rights action brought pursuant to 42.U.S.C.§ 1983 comprises three counts. In Count I, Brian Machesky ("Machesky" or "the Plaintiff") alleges that the Defendants violated a liberty interest protected by the Fourteenth Amendment to the U.S. Constitution by making or condoning defamatory comments that ended his law enforcement career.  Count II sets out state claims for defamation, libel, and slander, and in Count III the Plaintiff alleges that the Defendants interfered with his prospective contractual relations. It is respectfully recommended that the pending Motion for Summary Judgment (Doc. 65) filed by the Defendants be granted as to the section 1983 claim, and that the remaining claims be dismissed.

### II.  REPORT

**A.   BACKGROUND**

The Plaintiff was employed by Defendant, the Waynesburg Borough Police Department ("WPD")  from February 1994 until June12, 2005, when he resigned in order to accept a

position as a correctional officer at the Hazelton federal prison ("USP-Hazelton") located in Bruceton Mills, West Virginia.  (Doc. 68 Ex. E).  Machesky began a twelve month probationary period at USP-Hazelton on June 13, 2005.  Immediately after he was hired, the Department of Justice ("DOJ")  initiated a background check.  As part of this background check,  an unidentified federal  investigator contacted the WPD in July 2005, and spoke with WPD Chief of Police Hawfield ("Hawfield") and another WPD police officer, Lieutenant Bates ("Bates").  Id. The investigation ended on September 29, 2005. (Doc. 68 Ex. A at ¶11(a - e)).

The record shows that prior to completion of the background check, and after signing a document stating that he had been aware of the computer use policy at USP-Hazelton,  Machesky used a prison computer to forward to other government employees what he describes in his Second Amended Complaint as "innocuous and humorous political anecdotes regarding gasoline prices[,] the Bush/Cheney administration and Hurricane Katrina." (Doc. 29 at 5)  On September 27, 2005, USP-Hazelton Warden, Al Haynes ("Haynes"), met with Machesky in the presence of a union representative, and "gave [him] the following directive, 'Cease and desist from sending any offensive or inappropriate e-mails from Government computers and report any offensive e-mails that you may receive.'" (Doc. 68 Ex. F).

On December 5, 2005, Machesky learned that his email activity was still under investigation when he received a document entitled "Warning and Assurance to Employee Required to Provide Information,"  informing him that he would be "asked a number of specific questions regarding the performance of [his] official duties" in order "to obtain information which will assist in the determination of whether administrative action is warranted." (Doc. 68 Ex. G).  Machesky was warned that information gleaned during the inquiry  "could

2

result in disciplinary action, including dismissal," and was notified that he had the right to have a union representative present during the interview.

In an affidavit signed by Machesky the same day, he admitted that prior to Haynes's first warning about inappropriate email practices, he had sent what the Bureau of Prisons referred to as "a pornographic picture" of an African-American woman to a friend, Greg Smith. (Doc. 68 Ex. B at 101).  The Greg Smith who received the email, however, was an African-American Captain at another federal penal facility. In the affidavit, Machesky confirmed that he had also "emailed a [video] clip of a title 'Milk Shake Diva' to a select few of [his] contacts, on [an] unknown date." Id.   Although Machesky wrote that while he did not believe that these emails were pornographic, he agreed that they could "have been considered offensive in nature or obscene." (Doc. 68 Ex. G at 2).

On March 6, 2006, one of Machesky's fellow correctional officers, Scott Bartoe ("Bartoe"), was called to speak with personnel investigating "the same emailing incidents for which Machesky was under investigation." ( Id.; Doc. 68 B at 29). Machesky stated that Bartoe "forwarded me the e-mails that I forwarded."  (Doc. 68 Ex. B at 68).  Bartoe was disciplined by having to spend "one day on the street without pay."  (Doc. 29 at 5).  On March 7, 2006, Machesky was summoned to the office of human resources at USP- Hazelwood and was told that the results of the investigation[1] were unfavorable. Haynes summarized these results in a March 10, 2006  letter, which stated that on September 8, 2005, Machesky:

> forwarded an email . . .  with a subject line of  "Fwd: Fw: Diva
> MilkShake." [The] message stated, "3500 Watt generator for sale.

---

[1] Machesky's deposition testimony clarifies that Machesky is referring to the email investigation, rather than to the background investigation. (Doc. 68 Ex. B at 33).

> Let me know if you are interested." [The] message included a
> photo attachment of a scantily clad female in a provocative pose
> that exposed the lower half of her breasts.

(Doc. 68 Ex. H).  The letter also stated that earlier on the same day, Machesky had forwarded a

message with the same subject line and had attached a "video clip of a woman who [was] posing

for a camera exposing her breasts and genital area.  This video clip was pornographic in content,

sexually explicit"and "inappropriate for the Bureau work environment." ( Id.).   Machesky was

told that, as a probationary employee, he could elect early termination or request that he be

allowed to resign.  (Id. at 5-6). Machesky chose the former option, and was terminated on March

11, 2006.[2]

Machesky articulates the crux of his section 1983 claims as follows: "Plaintiff lost his job

not because of the e-mail, but because of false, defamatory and malicious statements made by

Defendants Chief Hawfield, Lt. Bates and the Waynesburg Police Department."  (Id. at 7).

Machesky claims that he reached this conclusion when he first saw the DOJ background report in

July 2006. [3]   Machesky contends that he was also told by union representatives "that the

_____

[2]The Plaintiff contends that in response to his filing an "EEO case" challenging his termination,
Haynes ultimately permitted him to file a letter of resignation in order to "clear his name." (Doc. 29 at 6).

[3]The background report (Doc. 71 Ex. H) reflects that the investigator spoke with Hawfield
between July 15 and July 25, 2005.  Hawfield informed the investigator that Machesky left the WPD
because "the prison guard position offers better pay and [Machesky] believes that it is a path to a federal
law enforcement position." (Id. at 1). He would be eligible for rehire. According to Hawfield, Machesky
was "intimidated by educated people, and does not like them." (Id.)  He "was somewhat of a good police
officer" and "did an excellent job investigating a murder case." (Id.) He did not, however, like the
mundane tasks involved with being an officer," and "didn't always follow through with the paper work
for drug arrests." (Id. at 2). Hawfield had heard "disturbing stories" about Machesky. (Id.)  Machesky did
not like the chain of command, enjoyed working, but would find a way out of inconvenient tasks.  He
was lazy, and would put parking tickets on cars' side windows rather than on the windshield because he
could do so without leaving the patrol car.  He changed a story to protect a friend, and had "several
complaints" made against him, "although none have been provable." (Id.).  Machesky let it be known that
he did not like being a police officer.  Hawfield was uncomfortable leaving his office unlocked when

background check was the cause of [his] early termination/ request to resign." ( Id. at 4-5).

Within three weeks of his departure from USP- Hazelton, Machesky was hired by Right Way Academy, a school for troubled teens. (Doc. 68 Ex. B at 71).

**B.     STANDARD OF REVIEW**

A party seeking summary judgment must demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The non-moving party must respond by presenting evidence that a genuine issue of material fact compels a trial.  (Id. at 324).  In doing so, the non-moving party must point to specific facts rather than to "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  This means that the non-moving party cannot defeat summary judgment by relying on unsupported assertions, bare allegations, or speculation.  See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir.1999).  The mere existence of some evidence

---

Machesky was around.  There were rumors that Machesky drank excessively and had "slept in the locker room at the station."  (Id.).  He reported to work on time, but did not devote "100% dedication to the force."  (Id.).  He enjoyed being an officer but did not like the work.  He did not accept blame when he was responsible, and had "misrepresented the department in contract negotiations." (Id.).  He had wired a cable through a file cabinet in order to watch television while he was on duty, and stopped at his residence while taking a police cruiser to be repaired. (Id.).  Hawkins told the investigator that Machesky "acts like a child sometimes . . , lives beyond his means financially, but is supported from his father." (Id.).  Hawfield stated that he was "not sure" that Machesky was capable of being a prison guard because he was not sufficiently mature. (Id.).  Hawfield concluded his comments by stating that Machesky "reacts well in emergencies," had "the ability to function well under stress," and was in "satisfactory physical health."  (Id. at 2-3).  Machesky's "stability and judgment [were] somewhat questionable." (Id. at 3).

Bates recommended Machesky for the USP-Hazelton position "with reservation because of subject's attitude." (Id.).  Bates expressed his opinion that Machesky "is very capable of being both a good police officer or corrections officer, but needs to mature." (Id. at 4).  "[He] is an 'overgrown child' who feels that everyone owes him." (Id.).  He disliked working evening or holidays, had honesty and integrity "when he wants to," was "a bully to other officers" and "was not well liked by the public as an officer."  (Id.).   According to Bates, Machesky was disrespectful, offensive, and used his power as a police officer to his own advantage. (Id.).  He did "an excellent job investigating a murder, but he did not like to do routine tasks . . . ." (Id.).  His income was "supplemented by his father."  (Id.).

favoring the non-moving party will not defeat the motion.  There must be enough evidence with

respect to a particular issue to enable a reasonable jury to find in favor of the non-moving party.

Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  In evaluating the evidence, the Court

must consider all facts and their reasonable inferences in the light most favorable to the

non-moving party.  See Pennsylvania Coal Ass'n v. Babbitt, 63 F. 3d 231, 236 (3d Cir.1995).

The Court may not assess credibility or the weight of the evidence; it may determine only the

existence of a triable issue of fact.  Big Apple BMW of N. Am. Inc., 974 F.2d 1358, 1362 (3d

Cir.1992).  A motion for summary judgment will be granted where the materials in the record, if

reduced to admissible evidence, would be insufficient to satisfy the non-moving party's burden of

proof at trial.  Celotex,  477 U.S. at 322.


**C. ANALYSIS**

      The Court considers the issues raised by the Motion for Summary Judgment seriatim.

**1.        Official Capacity Claims against Hawfield and Bates and Claims Against the Waynesburg Police Department**

The Defendants ask first that the Court grant summary judgment in favor of the

individual defendants with respect to section 1983 claim brought against them in their official

capacities. This request in essence, asks the court to eliminate a redundancy in the complaint in

that suing individuals in their official capacity is no different than naming the Borough multiple

times. A.M. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 581 (3d. Cir. 2002).  The Court

agrees that these claims should be dismissed. .[4]

_____

      [4]Though the Plaintiff purports to have asserted claims against the individual Defendants in their
individual capacities, it is clear that any such claim has been waived.  In its Report and Recommendation

Claims against the WPD should also be dismissed.  For purposes of section 1983, "municipalities and their police departments are treated as a single entity." Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 n. 4 (3d Cir. 1997).  See also Pahle v. Colebrookdale Twp., 227 F.Supp.2d 361, 367 (E.D.Pa. 2002) ("In §1983 actions, police departments cannot be sued in conjunction with municipalities, because the police departments are merely administrative agencies of the municipalities - not separate judicial entities.").

### 2.      The Plaintiff's Theory of Liability Under Section 1983

In order to maintain a viable claim under section 1983,  a plaintiff must establish at the outset that he was deprived of a constitutional right. See Kach v. Hose, __F.3d__, No. 08-3921, 2009 WL 4931636 at *13 (3d Cir. Dec. 23, 2009) (citing  Benn v. Universal Health Sys., 371 F.3d 165, 169-70 (3d Cir. 2004)).

In the initial Report and Recommendation (Doc. 39) adopted by the District Court, the Court found that Machesky did not have a property interest in continued employment at USP-Hazelton, and that he had not "allege[d] a plausible claim to a property interest in any other law enforcement position."  (Id. a t 8).  Job applicants do not have a property interest in anticipated

---

(Doc. 39) addressing the Second Amended Complaint, the Court noted that the Plaintiff had failed to specify whether he intended to assert claims against Hawkins and Bates in their official or individual capacities.  The Court invited the Plaintiff to amend his Complaint to clarify this point.  Plaintiff then sought leave to file a Third Amended Complaint  *in which he clarified that Hawkins and Bates were being sued in their official capacities.* (Doc. 42 Ex. A). The Court granted the Motion to File a Third Amended Complaint only to the extent that this Complaint "clarifie[d] that Defendants Hawfield and Bates are sued in their official capacities." (Doc. 49).  In all other respects the Motion was denied with prejudice. In an attempt to rewrite history, the Plaintiff now contends that "when the Court requested that Plaintiff clarify in what capacity he was suing Defendants Hawfield and Bates, his declaration that they were sued in the [sic] official capacity did not exclude them from being sued in the [sic] individual capacities." (Doc. 72 at 6).  In fact, that is precisely what it did. Given the multiple opportunities that the Plaintiff has had to articulate and hone his claims, he should not now be permitted to reinject confusion into what has been settled.

employment unless they can demonstrate a legitimate claim of entitlement to the position."  (Id.).

All claims premised on Machesky's property interest in employment were dismissed with

prejudice.

    The Court then found that Machesky had narrowly alleged facts sufficient to support a

plausible claim that he was deprived of a protected liberty interest in future employment.  The

Court took pains to explain then, and reiterates here, that in order to establish this interest, the

Plaintiff must show that:1) the Defendants' actions imposed a stigma or other disability which

foreclosed his freedom to take advantage of other employment opportunities or which would

seriously damage his standing in the community. Ersek v. Twp. of Springfield, 102 F.3d 79, 84

(3d Cir.1996); 2) the defendants publicly disseminated the stigmatizing information. Chabal v.

Reagan, 841 F.2d 1216, 1244 (3d Cir.1988); and 3) that the published information was

substantially and materially false or misleading.  Ersek, 102 F.3d at 83-84.  The Court of Appeals

for the Third Circuit has clarified that:

> reputation alone is not an interest protected by the Due Process
> Clause. Rather, to make out a due process claim for deprivation of
> a liberty interest in reputation, a plaintiff must show a stigma to his
> reputation plus deprivation of some additional right or interest.
> This has been referred to as the "stigma-plus" test.

Dee v. Borough of Dunmore, 549 F.3d 225, 233-34 (3d Cir. 2008) (quoting Clark v. Twp. of

Falls, 890 F.2d 611, 619 (3d Cir.1993), and Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3d

Cir. 2006) (internal quotation marks and citations omitted)).

    The Plaintiff argues that he has "successfully show[n] all requisite elements for a

reputational injury claim. [He] had a stigma placed on his reputation when Defendants spread

defamatory statements about him.  The plus element is satisfied because Plaintiff's opportunity for full-time employment with USP-Hazleton was foreclosed upon as a result of [the] defamatory actions." (Doc 72 at 7). [5]

There are multiple problems with this argument.  Most fundamental is the fact that Machesky has *not* established - or even adequately alleged - that he was deprived of a liberty interest.  As the Court explained in its first Report and Recommendation, the liberty interest implicated by reputational injury is the right "to pursue a calling or occupation, and not the right to a specific job."  (Doc. 39 at 11) (quoting Piecknick v. Pennsylvania, 36 F.3d 1250, 1259 (3d Cir. 1994)).  The Plaintiff's opposition to the Motion for Summary Judgment is limited to Machesky's resignation from a single probationary position at USP-Hazelton.

It is worth noting that even if it were possible to establish a liberty interest in a single job, the Plaintiff's section 1983 claim would fail. His contention that his background investigation report figured in termination/resignation is based on rank conjecture.  The record does not a

---

[5] In framing this argument, Machesky has abandoned the contention that he was foreclosed from pursuing law enforcement opportunities beyond USP-Hazelton.  Even had he adhered to the contentions made in his Complaint, the claims based on foreclosure of career opportunities could not have survived summary judgment.  In his statement of undisputed facts, Machesky notes that after he left USP-Hazelton, he applied for a job with, but was not hired by the Intermediate Unit of the Greene County Police Department.  There is nothing in the record, however, to connect the fact that he was not hired to statements made by Hawkins or Bates.  In fact, there is nothing in the record showing that personnel in Greene County contacted or communicated with any of the Defendants.

The evidence regarding Machesky's application for a position with the Cumberland County Police Department is also deficient.  In his deposition, Machesky alleged that the was not hired for this position because the Cumberland police chief spoke with Hawfield, who made negative comments about him. Id. at 75.  This statement alone is not evidence for purposes of summary judgment, and there is nothing else in the record to support his contention.

The Plaintiff also failed to adduce evidence showing that the Defendants were in any way responsible for the fact that he was not hired by the Pennsylvania State Police.  The record shows that Machesky, despite numerous applications and attempts, had never advanced far enough in the testing process to be eligible for hire, and that he voluntarily withdrew his last application without having passed the qualifying tests. (Doc. 68 Ex. B at 79-82; Doc. 71 Ex. J at 26-29).

sliver of evidence that Machesky's loss of the probationary position at USP-Hazelton was based on anything other than his own misconduct. The nature of the "evidence" on which Machesky relies to support his claim against the Defendants is illustrated by the following exchange at his deposition:

> Q   Now, you allege in your lawsuit . . .that you believe you were terminated from the Bureau of Prisons because of the background investigation . . .  Is that your allegation in this lawsuit?
>
> A   I  honestly believe that it had a great deal to do with it.
>
> Q   What made you have this belief or what were the circumstances leading up to making this claim?
>
> A   Once I had seen what my previous employer said about me and the false things he said about me, it doesn't take much of a person to believe that . . . someone is building a case against you . . . [T]hat would make me believe that they were looking to fire me after they seen [sic] that.
>
> Q   Do you have any knowledge as to whether any of the individuals involved with the investigation of the e-mails and ultimately your termination or resignation, as the case may be, do you know whether any of then ever saw your background investigation that OPM conducted?
>
> A   Just going by what the union representatives told me and how the investigations are handled in-house, that's one of the stepping stones on investigating that employee, which is to look at your jacket, see what kind of person you were prior to their employment; and that is what I went off of, what they said.

(Doc. 68 Ex. B at 49-50).  Later in his deposition, Machesky testified that he and the union representatives had "discussed other cases that had happened in the government with any disciplinary actions or probationary people and then what great extent they took to terminate me

10

over something so minor.  We all came to an agreement that based on that, that they would see why I would be tarnished the way I was." (Id. at 52).  The record does not include deposition testimony or affidavits from these witnesses, and does not disclose that their opinions were based on anything other than speculation.  This testimony is altogether insufficient to defeat the Defendants' Motion for Summary Judgment.

Given  the Plaintiff's failure to establish that he was deprived of a constitutional right, the Court need not reach the Plaintiff's incomprehensible arguments regarding municipal liability.

3. **The State Law Claims**

Supplemental jurisdiction in the district courts is governed by 28 U.S.C. § 1367. The statute provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  This statute authorizes a district court to decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  Because granting the Defendants' Motions for Summary Judgment resolves the only extant federal claim, the Court, in the exercise of its discretion, should decline to retain supplemental jurisdiction over the state law claims.  See King v. County of Gloucester, No. 07-3954,  2008 WL 5158744 at *6 (3d Cir. Dec.10, 2008) (quoting Novak, v. Metrohealth Med. Ctr., 583 (6th Cir.2007) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims.")).  The Court cannot discern any reason to reach a different result here.

11

### III.  <u>CONCLUSION</u>

For the reasons set forth above, the Court recommends that the Defendants' Motion for Summary Judgment (Doc. 65) be granted with respect to the section 1983 claim, and that the remaining state law claims be dismissed.

Respectfully submitted,

/s/ *Amy Reynolds Hay*
Chief United States Magistrate Judge

Dated :   6 January, 2009

cc:     Counsel of Record via CM-ECF